Bench. So, Judge, it's a pleasure for me and Judge Marino, on behalf of all of us in the federal judiciary, especially here in and around the 11th Circuit, to welcome you to the court. Well, thank you very much. I'm very pleased to be here. Judge Newsom brings some pretty impressive credentials to the 11th Circuit, having distinguished himself in the private practice of law with a very prominent law firm. His prior service as Alabama Solicitor General. I don't know how much more Judge Newsom can contribute on the other side of the bench. He's argued 35 appeals in the United States Courts of Appeals. He's argued four cases in the United States Supreme Court. And so, we're really expecting Judge Newsom to kind of hit the ground running. In fact, he's only been a member of the already prepared himself for 13 arguments this week. And I also thank Judge Newsom. It's altogether fitting and proper that your first sitting, your very first sitting as the United States Circuit Judge take place here in your home state of Alabama. Thank you very much. It's a real pleasure for us to welcome you to the court. And I look forward to serving with you as a colleague for many years. It's also a great pleasure to have Judge Moreno back with us. Judge Moreno sits with us from time to time. Judge Moreno hails from the Southern District of Florida where he previously served with great distinction as Chief Judge. There are a lot of great things I can say about Judge Moreno, including his selection by the 11th Circuit to serve as a member of the Judicial Conference of the United States, the 11th Circuit's representative to the Judicial Conference of the United States, where he serves as a member of the Executive Committee. But I would have to say his most impressive credential, at least in my humble estimation, is the degree that he received from the University of Notre Dame. We're in Alabama. So welcome back, Judge Moreno. Well, we have three appeals that are scheduled for oral argument this morning. And I see that counsel in the first appeal are ready to go. This is United States of America versus Jeffrey Allen Nursi. And Mr. Matthews is here for the appellant. Mr. Neely is here for the appellee. Mr. Matthews, are you ready to proceed? Yes, Your Honor. May it please the Court. Judge, welcome to the bench as well. Thank you. I have the pleasure of representing Mr. Jeff Nursi on appeal. There's three arguments that have been made on the appeal. The initial one being that the trial court erred in denying the motion to dismiss the indictment as the statute is unconstitutional. In this case, Mr. Nursi was charged with a retaliation under the Retaliation Statute, which was originally brought in under the Sarbanes-Oxley Act. And this criminalized retaliation against a witness who has provided information to the government or to a law enforcement officer. The information has to be truthful, has to be related to a commission or possible commission of a violation of federal law. The interference and the retaliation has to have a harmful effect on that individual witness. In that, it has to include interference with their lawful employment and or livelihood. Can I ask you a question about that, just about the language of the statute? Yes, sir. So, as I read the language, it says, takes any action harmful to any person, including interference with lawful employment or livelihood. Why is it that both sides, and I could ask the same question to the government, but why is it that both sides have focused solely on the interference with lawful employment? As I read the statute, sort of the principal criterion is harm. One of those forms of harm might be interference with lawful employment. Why not just harm? And, Your Honor, I think in this case, what I was going to mention in my arguments is the government has mentioned that. There was not a demotion. He was not fired from his employment at the time that these flyers were posted or mailed. But actually, at trial, there was no testimony of any harm in his life, much less his employment. He didn't testify that, hey, this made me depressed. I had to go, you know, seek medical attention. He didn't mention that he wasn't sleeping because this has caused so much harm in his life. His reputation was not impacted by those flyers at all. Not at all. No witness. And they brought multiple witnesses. That's why his wife bought a gun. Well, Your Honor. She didn't feel like she would be attacked or that something would happen. Well, the wife, Your Honor, is not part of who the witness was that was retaliated against. And that's part of the argument also is the wife was brought into this case. And she's certainly not part of the parties in the case. She was not a witness. She did not provide previous information to the officer. So if it harms the marriage, for example, let's say they were to get divorced because the wife believed the flyers, that would be sufficient harm. I apologize for interrupting. If he testified that, yes, sir, this caused strife within my marriage. And because of this, you know, these are the ramifications from these actions. You know, I lost the relationship with my children and had to switch churches. My wife and I, you know, the strife it caused between us because she's saying, hey, I did all these horrible things now. So it has to reach that level. You have to be fired from your job if your coworkers or your superiors truly believe that he was a sexual child molester like the flyers suggested, not suggested, said it. And then that would not be sufficient harm. You actually have to be fired from your job. You actually have to be divorced. That's the harm. The statute requires harm to the person, including interference with employment or livelihood. And there was no testimony in this case that that harm occurred. Your Honor, it's kind of akin to a defamation lawsuit. If nobody believes it, there's no harm. But isn't there some testimony? I mean, especially given the standard of review, there's some testimony that neighbors pulled away. His wife, I think, did begin to doubt him, although she stayed with him or something like that. Am I just misremembering? I don't recall any witness, especially not the neighbors, saying, hey, we didn't go to barbecues with them anymore. We didn't hang out with them anymore. It was it was we had a flyer and we threw it away, was the statement of the neighbor. Didn't he state that he thought he would lose some because of the marketing, because he dealt with children, too? Didn't he say something that he thought that would affect him? Your Honor, I think he said, and I quote it and I can dig it if I need to. I would be surprised if it didn't cause harm. All right. So I'm sorry. So who testified? And I'm just reading from a quotation. Passano's neighbors, quote, withdrew from him a little bit and his co-workers were in shock. Passano's wife testified that receipt of the flyers caused her to have a, quote, hint of doubt about her husband. Why isn't that harm? Whether or not we're talking about interference with lawful employment, but why isn't that harm within the meaning of the statute? Well, Your Honor, the harm that he suffered and Mr. Passano, I don't think testified to that. I may be mistaken about that. I can check it. I think it's other witnesses because the questioning was very specific by his trial counsel about, and it went through, and I listed it in my briefs in a couple of sections. What about your job? Did you get demoted? What about your church? Were you taken away from helping with Sunday school or any of these other organizations? And even the other, there was testimony also from other employment company, not employment companies, other companies near his employment, and they said they got this flyer. Well, did you think any less of him? No. You know, nobody, there was no harm necessarily. Nobody believed it. It was obvious, you know, that this was somebody doing something harmful necessarily as far as a statement, but the actual harm in Mr. Nursery, I'm sorry, Mr. Passano's life, there was no testimony of that. They were trying to, but there was just no harm actually committed to Mr. Passano. The sufficiency of the evidence issue your strongest, or is it the void for vagueness? Your Honor, I would submit that probably the sufficiency of the evidence, that's the harm, is a little bit stronger. The statute, however, actually my three arguments kind of fall into line with that, with the sufficiency of the evidence arguments because they kind of hinge on one another. The harm is what's the vagueness in the statute that is argued. And then when you go to the sufficiency of the evidence, that's where the record is devoid of harm and actual testimony from the witnesses that Mr. Passano did suffer this way. And then, of course, on the argument on the jury instruction, it's speculative charge that was requested to be made that was not given by the court. And, of course, the position is that the speculation in this case was that there was harm, one. What's the difference between the speculation instruction and the reasonable doubt instruction? Well, Your Honor, the reasonable doubt instruction goes to if there is a doubt in minds, and it covers whether there's sufficient evidence. But the speculation is that you can't convict a person if you think, hey, this might have happened. If the evidence is speculative. Doesn't that apply to every single criminal case? In other words, if we were to require that, it seems like every trial lawyer can say in closing argument, you cannot speculate, you cannot guess. It has to be proven beyond a reasonable doubt. We would have to reverse every judge who gives the standard reasonable doubt instruction, no? Well, Your Honor, I think it depends on how the evidence is portrayed at the trial. And in this case, Mr. Nursi's arguments and his defense were the speculation of this circumstantial evidence case. This is an instruction I would imagine that's requested quite frequently. Are you able to point us to any authority whatsoever where the refusal to give a speculation instruction constituted an abuse of discretion? Your Honor, I'm not at this point, I know in the N. Ray Winship statute, I'm sorry, the case that was cited by the trial council was submitted as it being a correct statement of law and in support of it. I'm not aware of case law as we stand here today on that issue where it was not allowed or was allowed. So I think of Winship as the sort of the quintessential celebration of the beyond a reasonable doubt standard. And I mean, do I have it right that it was the pattern instructions that were given here? Yes, sir, it was. And not that that's conclusive, but I mean, is it going to be your position then that in any case, to Judge Wilson's point, that relies on circumstantial evidence that you have to have this instruction? No, sir. Not in every case. It's just depending on the case and how the evidence shakes out at trial. Before you leave, if we can go back to the void for vagueness issue. Yes. Is there any reason why, since the term harmful is not defined in the statute, is there any reason why we can't look to the dictionary definition of the term harmful? Well, Your Honor. Or the word interference? Your Honor, and I actually mentioned in my Webster's where I went to online, of course, nobody pulls out the hardback books anymore. We all go online and look. And interference is defined as involvement in the activities and concerns of people when involvement is not wanted. And then there's also... Does that just apply here on point? Well, Judge, I would submit also that in this case, the involvement in the actions and the concerns of other people, the involvement... Basically, Mr. Passano said, look, this happened and there was no injury to me. There was no loss to me. And that's what the statute requires. And the interference in this case is difficult to ascertain because of that. Other than these flyers being posted or sent, that's like other than that, Mrs. Lincoln, how did you enjoy the play? I mean, the flyers, as Judge Moreno suggested earlier, at least the one that I've seen in the record is pretty disturbing. Isn't it harmful just by itself? Does it have to be successful? It seems like you're arguing that the interference has to be successful. In other words, if you pass out these flyers, and I'm too embarrassed to put on the get it. Why isn't that harm by itself? Even if eventually they believe you and they say, well, he's a good guy. He couldn't possibly be a child molester, do that. He does things right after church. Why isn't that harm by itself? It has to be successful. He has to be thrown out of the church and thrown out of the job. Your Honor, we just have to go by what the statute says. And that's what we're restricted to. There are other charges under the Alabama statutes. That's a better statute, you would say. And if it was proven, if the evidence was submitted, I think it'd fit on all corners. In this case, though, Judge, when you're looking at what the statute says, it says there has to be harm to the individual and it has to include interference with his livelihood or his employment. And the testimony in this action just didn't. Matthews, we have your argument and you've  And so we'll now hear from Mr. Neely. Thank you, sirs. May it please the Court. Good morning, Your Honors. My name is Ryan Neely. I'm the Assistant United States Attorney here in the Middle District of Alabama. And I here representing, of course, the United States here on appeal in the matter versus Jeffrey Allen Nersey. We've always been taught to have a kind of an opening two-minute speech and then wait for questions. And I'm not suggesting that we do that today, but I'm suggesting that there are so many questions that are already out there, I would like to attack a few that I've already heard. First, what does the statute say? I believe it was kind of something I inferred from, I think, a question from Judge Newsom. And I would like to take this moment to break the statute down, if I may. Whoever knowingly with the intent to retaliate takes any action harmful, and we have lawful employment or livelihood of any person, comma, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of a federal offense shall be fined under this title or imprisoned not more than 10 years or both. Well, I actually disagree with Mr. Matthews. I think his strongest issue is the void for vagueness issue. And so we take a look at the statute and make a determination as to whether or not it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited. And that, I think, his argument on that is weak. But then, or, we've said authorizes or encourages arbitrary and discriminatory enforcement. Why didn't the statute authorize or encourage arbitrary and discriminatory enforcement? First, within the statute, it's limited itself to the person subject to the statute lawfully is a finite class of individuals. You know, those individuals who have provided on occasions prior or during the course of, have provided information to law enforcement officers in the pursuit of their duties. So, first, we have a finite class of persons that could be touched by the statute within its meanings. Secondly, we have the term, and I'm assuming without asking, but the court's concerned about the term harmful and interference. Well, in many matters of criminal law, a great degree of these, many of these situations are left to the sound discretion of first, federal prosecutors to determine whether or not this particular action was in fact harmful or could be harmful by its nature. That's a matter within our discretion. Secondly, whether or not it interfered, that too is a matter within our discretion. And that discretion, of course, is subject to being checked every step of the way. Well, let me pose a hypothetical for you. Let's assume he didn't send out the flyers, but he just went around telling, you know, neighbors and friends, they were mutual friends, they worked together, he and Mr. Passano. He just went around saying, don't trust this guy, Mr. Passano. He's a snitch. He's lower than a pedophile. In fact, he is a pedophile, verbally, just telling people like that. Would that violate the statute? In my opinion, yes, Your Honor. Again, if, and mind you, if... He told two or three people that. Would that violate the statute? Yes, Your Honor. If he did so with the requisite mental intent, in this case, which is to retaliate against Mr. Passano for having provided information to law enforcement officers. If that's the case, this is a pretty broad statute then. Very broad and all-encompassing statute. Doesn't it sort of give law enforcement a lot of discretion with regard to whether or not they're going to charge him under the words of this statute? Your Honor, and again, as I was stating earlier, yes, they do have discretion. They have discretion in their everyday affairs. They have discretion as to whether or not to pull over a car that, in essence, is going 10 miles over the speed limit. But within their discretion, they decide not to do so. We can't have criminal statutes though that give law enforcement discriminatory and arbitrary enforcement responsibilities, do we? I don't. Excuse me. I was about to say I disagree. No, I do not disagree with you, Your Honor. What I would like to state, however, as I was stating earlier, discretion. Discretion as to whether or not to bring criminal charges, whether or not to proceed with criminal charges, the discretion as to whether or not the criminal charges are, for lack of a better term, rightful or righteous. It flows from the minute the policeman intercedes. How do we answer this question? It seems to me there's so many cooperators, right? That's a typical thing. You've had that example. Yes, sir, Your Honor. So that means a lot of defendants will go back to the prison or even in the neighborhood and say, as the judge has indicated, he's a lying snitch. Let's keep the pedophile thing out. A lying snitch. I'm sure that happens all the time. Would you concede? I would concede that, Your Honor. Yes. Okay. Would something like that be sufficient to charge under this statute? A defendant saying to the other defendants in prison, so and so is a lying snitch. If, Your Honor, if that particular imprisoned person, the one who makes a statement, he's a lying snitch, does so with the mental intent to retaliate against this person. To have others in prison beat him up or something like that. Exactly. If there's some... Yes, sir. Excuse me. I didn't mean to interrupt. That's okay. I do that too. Get a little excited up here. Yeah, but in that instance, there would be harm, right? If, in fact... If he got beat up. Yes, absolutely. There'd be unquestionable. We'd have pictures of that harm. And that's an excellent point because in the questioning of Mr. Matthews, the court inquired about harm. That would be easily ascertainable harm. No question about it. We'd have pictures. We'd have medical records. We'd have all kinds of items of evidence that we could bring forth to a jury to say... What if he weren't beat up, but he's afraid of being beat up? Because in prison that happens. Is that enough? That may, in fact, come down to that discretion that we're afforded all along the way from the law enforcement officer to the correctional officer, to the warden, to the assistant United States attorney or the United States attorney's office who would prosecute that matter in the event it came out of a federal prison, through the trial court, ultimately to this court, and perhaps beyond. Discretion runs throughout our system. So let me ask you this. So really, I wasn't asking just Mr. Matthews. I'm curious, because your brief as well really focuses not on the term harm in the abstract, but instead on the interference with lawful employment as an aspect of harm. Was that a charging decision? Is that the way the indictment reads? Is this an interference case or a harm in the abstract case? The indictment was charged that he attempted to interfere with employment and the economic livelihood. However, as the matter unfolded in front of the jury, you could say, you could infer from the way the case played out that, in fact, the harm being vindicated or attempting to be was more of the emotional relationship, those things that we all like to protect, such as our reputation. Didn't Mr. Passano testify to that? Yes, Your Honor. He suffered. He did. Back at page 39 of the brief, page 40, excuse me, of the record, page 39, he... He testified that he suffered damage to his reputation? He would not say as much that he knew of any, but he did state... Was there any damage to his reputation? Not that was present in the record, Your Honor. Let me say this. Don't you have to have damage to his reputation in order for there to be harm to take place? And if there's no damage, if everybody said, I didn't believe that stuff, Passano is a great guy. If we were required to actually prove something is... Sorry, I can't select the correct word. There's a reason for the word harm in the statute, right? It's got to be harm. And harm can mean many things. Harm can mean reputation. Harm can mean his own personal sense of well-being, personal sense of his sense of self. Harm is a very broad word. Was he the one, is Mr. Passano the one who said that the neighbors withdrew a little bit at first? Was he the one who said that and were in shock or who else said that? That was Mrs. Passano, Your Honor. She said that. That's correct. She started doubting because her husband was being accused of being a child molester and homosexual. She started doubting that. Would that be sufficient harm if it affects your relationship with your wife? Which is the most intimate of our personal relationships, that with our spouse. Yes, that would be harm. There's a very... I'm not sure of the court's marital makeup. I can speak of my own. And that is things that affect me, things that affect my reputation, things that affect my sense of well-being, my sense of self, directly affect my wife. And he also said that his employment depended on trying to... his professional success depended on referrals from other medical professionals and on maintaining a good reputation in the community. That's correct. And again, I think we need to look at just very briefly some of the particular facts of the case in response to that question I'd like to point out. Mr. Passano was employed, as the record's clear, and I'm sure the court's aware, in a business called All Ears Hearing Center. It was made up of Mr. Passano, who is a... I can't state that the record says, nor am I aware as to whether or not he was a certified doctor of audiology. However, it is clear that he fitted and made recommendations and fitted persons for hearing aids, hearing instruments. Including children, right? Including children. And he was employed at All Ears Hearing Center by Dr. Rick Love, who is a medical doctor, an ear, nose, and throat specialist. So we see how this all works together. All Ears treated children as well as adults. Mr. Passano, once a determination... that this child or adult may, in fact, need some apparatus to aid them in their hearing, they would go from Dr. Love to Mr. Passano, who would help them select and fit the appropriate hearing device to aid them to respond to the hearing condition from which they suffered. So, interestingly enough as well, talking about the reputation, and this brings to mind Dr. Love. Now, let me be clear. I've got about three different thoughts emerging, so bear with me if you would. First, let's be clear about one thing, and in fairness to the defendant. The flyers themselves were not posted at All Ears Hearing Center. And I see that Judge Marino had had one of the flyers in his hand earlier. I do. As an aside... I won't pass it out, though. Correct. And as an aside, Your Honors, we had a very collegial discussion in our office just last Friday about whether or not I should open this by reading into the record the exhibits number 10 and 7, which are, in fact, the two flyers. I see that Judge Marino has exhibit number 7. He himself is not comfortable reading it into the record. If the other members of the court would like it read into the record, I would not say more than happy to, but I would be more than accommodating to the court's request. It's graphic. It's vile. It's reprehensible. There's just no other words to describe it. So, those flyers were sent to... I'm sorry. Yeah. So, I thought in response to a question that Judge Wilson asked, you answered, and I was surprised by your answer. You said that this really fundamentally is not about his reputation. I thought that your case really sort of rides on his reputation. I didn't mean to imply it. Now, his reputation is an issue here. That was harm caused. No, we don't have somebody that got on the witness and said, yeah, because of what that nursing guy said, man, I'd never go see Dr. Love or particularly Mr. Passano. Your point is that a reasonable juror could infer that there was damage to his reputation. Absolutely. The nature of the statements, again, vile, reprehensible, in and of themselves. How can you not infer some harm to his reputation or his standing was not at play and did not occur? The neighbors. Now, there were two flyers, and it took me a second to sort this out as well, and I want the court to be absolutely clear here. There were two, in fact, two flyers, as we're all aware. The one flyer was sent to the neighboring businesses of All Ears Hearing Center. That's the one where it refers to, that's government exhibit number 10. And it begins. Are you saying that the jury can infer damage to reputation in the absence of evidence? On the basis of reputation. I'm sorry. In the absence of any evidence to his reputation, the jury can infer damage to his reputation. When the damage, or when the attempted damage, or when the flyers are such an incredibly vile, reprehensible. See, this is how you would distinguish the defendant saying he's a lying snitch, period. That may not be enough, would it? That may not be enough because, and then it would be too vague. But 12 flyers, how many flyers were there? Probably 12, as I recall. I think that's correct. 12 flyers directly to individuals with so much detail mentioning St. Bede's Catholic Church, what they do when they go out of church, that the detail of it may be sufficient harm, as opposed to a general statement. He's a lying snitch. And I hate to concede that for the simple reason this, Your Honor. Final prosecutor. Fellow prosecutors, we're all about our discretion. I know. I do not want to go that way. But we're concerned with that. That's the problem. I do not want to give away our discretion here to concede it. But let me say in a real world situation, yes, Your Honor. I know as a federal prosecutor, I would look at that case of the lying snitch with a much more jaundiced eye than I would the case here. There's no question to me, and I'm just one of many persons, lawyers, federal prosecutors. But there's no question to me that the incredibly, incredibly vile, reprehensible language within these flyers and placed it places such as one businesses. Now, I would say this, the government's exhibit number 10, warning queer in your community. That was that's headed such and continues by saying this is your sexual child molester neighbor. It's my understanding that those are the ones that were placed near the business. Near the business. Of course, it contains the business's logo, or shall we just loosely say trademark, all ears hearing center. It gives the address of the business. Also, by chance, as the court may have noted, includes the home address. I think we have your order, Mr. Neely. Your Honors, thank you. Thank you. And Mr. Matthews, you have reserved some time for rebuttal. Yes. In response and rebuttal. I think everybody reads this case and looks at the facts and cringes. There's no doubt about that. I appointed by the Criminal Justice Act to represent Mr. Nersey here today. And I initially look at it and I go, wow. But then you look at the facts that were submitted in this case and the ones that the jury heard and that the trial judge heard and that we are here talking about today. And all of us go, something's wrong here. This guy ought to be guilty of something because that's just horrible. Is this statute substantial? This federal statute substantially different from the Alabama statute? Yes, sir. Would you concede that under the Alabama statute that that is certain enough? It's not vague and that the evidence would be sufficient for that? Your Honor, in the harassment charge, there's a harassing communications provision. And if this statement was made and the witness testified, hey, the intent was to annoy or alarm or harass me and it did. You would concede that the intent here was to annoy and harass, would you? Yes, sir. So if we had a federal statute like the Alabama statute, you wouldn't have anything to argue? Well, and the difference is the federal statute has to do with the former witness in a case that provided truthful information about a federal offense. But that was proven here or it's not a strong argument for you? That's what I've been told, Judge. And certainly, I would submit also that the application of this statute could also apply, an example was given in the motion to dismiss, if a husband and wife provide information and later they get divorced and then the wife comes back and says the husband is harassing me now in the divorce. If the husband provided information to an officer about some actions the wife had done, it would be applicable in that case if it was chosen to be picked up by the prosecutors. It's just concerning that the discretion in this case, I have no doubt the agents looked at it and said, we got to do something in this case. The information that was submitted in the prior case was not of a federal offense even. Mr. Passano provided information to the officers that, well, there was a Blue Cross Blue Shield logo on this flyer that this gentleman in Huntsville was doing and I didn't think it was right, so I didn't want to be involved in it. He was fired for how he voiced his opinion from the company by the owner of the company, not my client. And then these statements get made or posted, sent out, and now it's that Mr. Nursi has done it in retaliation for that. Well, there has to be truthful information provided, Mr. Passano, regarding a violation of a federal offense. And then it has to have a harmful or interference in his livelihood or employment. And in this case, I feel like, one, that the statute is applicable to everybody in some context, it seems like, in the argument. And then the harm itself because of, and the reason I guess both myself and the government relied on this is because that's, it was a glaring void, in my opinion, in the statements. I do personal injury work as well as criminal defense for the criminal justice panel. And if I've got a client who comes in after a car wreck and says, yeah, my back and neck were hurt and said, really? How bad were they hurt? Because I want them to hurt bad, of course, in personal injury cases. And then they get in testimony and a deposition and they go, how's your neck and back? It's great. I can't come back and fix that. Their testimony is what the case is based on. In Mr. Passano's case, that's what this case is based on, is his testimony. If his wife felt concern, that would be a harassment charge under Alabama law. She's not a former witness to a federal officer about a violation. So you don't think any other witness's testimony can bear on whether there was either harm or interference in his lawful employment? I think it would have to be, I think it would have to corroborate Mr. Passano's testimony. In my opinion, because he is the witness that is being retaliated against under the statute and he is the one that has to suffer harm. If his relationship with his wife, if strife was caused by these statements, he didn't testify to. If it was, if his reputation was damaged and he lost referrals, there was no testimony of that. As a matter of fact, the folks in his office testified, no, he's held in the same. But if he says, you know, I felt bad. I just had to deal with it. You know, everybody knows me. They know I'm not a pedophile. My friends and neighbors, they know this is garbage. But I just had to deal with this. This is just bad stuff I had to deal with. Isn't that enough for the jury to infer harm? I think if that was the testimony, yes, Judge. But he didn't testify to that? I don't recall a testimony about that. And it was, in review of the record, it was surprising to me that those questions weren't asked and it wasn't elicited. Maybe it's because he's a male. And as males, we don't like to say we hurt and things bother us. And, you know, we like to be manly men and we're not hurt by stuff like that. But the reality is, the charge is that he has to be harmed. And there was just a lack of that in this case. All right. Mr. Matthews and Mr. Neely, we have your arguments. Thank you very much. And Mr. Matthews, I see that you were appointed by the court pursuant to the Criminal Justice Act. And we appreciate your representation of Mr. Nursi. Thank you very much, Judge. Welcome to the bench again, Judge Newsom. Thank you. Thank you.